**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

———————————————————— :
UNITED STATES,                              :
                                            :
              v.                            :
                                            :         Crim. No. 96-114 (RBK)
ANDRES FERMIN,                              :
                                            :         **OPINION**
              Defendant.                    :
———————————————————— :

**KUGLER**, United States District Judge:

      **THIS MATTER** comes before the Court upon Defendant Andres Fermin's Motion for

Reduction of Sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) (the "Compassionate Release

Motion" or "Mot."). (ECF No. 734). For the reasons set forth below, the Court **DENIES** the

Motion.

**I.      BACKGROUND**

      **A.      Procedural Background**

      Mr. Fermin is an inmate in federal custody at United States Penitentiary, Canaan ("USP

Canaan"), in northeastern Pennsylvania. (ECF No. 743, Gov't Opp'n Br. at 2).[1] On March 18,

1997, Mr. Fermin was sentenced to life in prison after a jury found him guilty of RICO

conspiracy, the objects of which were heroin distribution and murder; substantive RICO

offenses; conspiracy to distribute heroin; and individual acts of heroin distribution. (ECF No.

734-1, Def.'s Br. at 13–14).

———————————

[1] All citations to specific pages of the parties' briefs use the page numbers generated
automatically by the ECF system.

To initiate the present Motion, Mr. Fermin first requested on January 11, 2022, that the warden of USP Canaan file a compassionate release motion on his behalf. (Gov't Opp'n Br., Ex. C).[2] The warden denied that request on January 21, 2022. (*Id*., Ex. D). Through counsel, Mr. Fermin made a similar request of the warden on August 10, 2023. (Def.'s Br., Ex. B). On August 15, 2023, the warden again denied the request. (*Id*., Ex. C).

Mr. Fermin filed the present Motion on September 30, 2023. The Government opposed Mr. Fermin's Motion in a brief filed on January 31, 2024, (ECF No. 743), to which Mr. Fermin replied on March 8, 2024. (ECF No. 748, Def.'s Reply Br.).

### B. Factual Background

#### i. *The Offense*

According to the Presentence Investigation Report ("PSR") prepared by the U.S. Probation Office for Mr. Fermin's sentencing, Mr. Fermin was part of a Camden-based drug trafficking organization launched around 1991 or 1992 by brothers Victor and Frankie Gonzalez. (PSR ¶¶ 27–28).[3] Mr. Fermin joined the "Gonzalez organization" in 1994. (*Id*. ¶ 29). Mr. Fermin became a co-leader of the group alongside Victor Gonzalez and performed a variety of tasks: he supplied heroin to the group; recruited drug sellers; selected "managers" among the lower rungs of the organization; made his Queens, New York, apartment available for processing and packaging heroin; stored heroin at his residences in Camden; transported heroin between Queens and Camden; delivered heroin to street dealers; and collected money from the heroin sales. (*Id*. ¶¶ 29, 33–35, 76). According to testimony at Mr. Fermin's trial, Mr. Fermin and other members of the Gonzalez organization carried guns. (*Id*. ¶ 36).

---

[2] Due to concerns about revealing confidential information, the Government submitted its Exhibits B, C, and D directly to the Court. *See* (Gov't Opp'n Br. at 2 n.1).

[3] Mr. Fermin's PSR is on file with the U.S. Probation Office in the District of New Jersey.

The Gonzalez organization was responsible for the murder of a man named Eric Coleman on December 29, 1994. (*Id.* ¶¶ 37–38). Mr. Coleman sold drugs from a location near a corner controlled by the Gonzalez organization. (*Id.* ¶ 37). Not only was Mr. Coleman a competitor, but also he was known to be a police informant providing information about the Gonzalez organization. (*Id.*). During a meeting at which Mr. Fermin was not present, members of the Gonzalez organization discussed a plan to kill Mr. Coleman. (*Id.* ¶ 38). Brothers named Felix and Richard Roche carried out the murder, fatally shooting Mr. Coleman, for which Victor Gonzalez paid them $5,000 in cash. (*Id.*)

Whether Mr. Fermin knew about the plan to kill Mr. Coleman is unclear, but an alleged object of the RICO conspiracy of which he was found guilty was the murder of Mr. Coleman. (*Id.* ¶¶ 13–14). Testimony at trial revealed that Mr. Fermin was in Queens, not Camden, at the time of Mr. Coleman's murder. (*Id.* ¶ 79). On the night of the murder, Mr. Fermin was receiving money delivered by Ramon Roche, the uncle of Felix and Richard Roche. (*Id.* ¶¶ 63, 79). Ramon Roche, who had previously refused a contract to murder Mr. Coleman, testified that Mr. Fermin uncharacteristically coaxed him to stay at Mr. Fermin's apartment in Queens. (*Id.* ¶¶ 37, 79). In hindsight, Ramon Roche testified, he believed Mr. Fermin knew about the murder and wanted to keep him away from Camden so as not to interfere. (*Id.* ¶ 79). The Probation Officer who prepared the PSR recommended that Mr. Fermin receive a four-point upward adjustment to his base offense level for having been an "organizer or leader" of the Gonzalez organization's drug activity, but that "no role adjustment is warranted for his role in the murder." (*Id.* ¶¶ 80, 108, 114).

ii. *Mr. Fermin's Medical Conditions and Behavioral Record*

Mr. Fermin, now 68, has been incarcerated for more than 27 years, starting with his initial arrest on November 14, 1996. (PSR at 1). Neither party submitted medical records for Mr. Fermin. However, in the brief accompanying his Motion, Mr. Fermin notes that he has twice been infected with and recovered from COVID-19, is obese, and needed surgery in May 2023 to repair a hernia. (Def.'s Br. at 20–21). According to a letter from Mr. Fermin's attorney, Mr. Fermin continues to experience pain from the hernia surgery and, separately, has difficulty using one of his arms following a surgery to fix nerve damage there. (ECF No. 736). The Government adds that Mr. Fermin "has several chronic medical conditions, including hypertension and hyperlipidemia," and has been vaccinated against COVID-19, influenza, and pneumonia. (Gov't Opp'n Br. at 3).

Mr. Fermin has a record of roughly a dozen disciplinary infractions while in custody. (Def.'s Br., Ex. E; Gov't Opp'n Br., Ex. B). His most recent disciplinary incident occurred in 2017 when he was sanctioned for fighting with another inmate. (Gov't Opp'n Br., Ex. B). Several of the infractions are minor, with the most serious being three instances of possessing a dangerous weapon in 2000, 2007, and 2008; and assaulting another person with serious injury in 2000. (*Id.*).

iii. *Letters Supporting Mr. Fermin's Motion*

Mr. Fermin submitted seven letters in support of his motion: one from himself, (Def.'s Br., Ex. A), and six from family members. (*Id.*, Ex. D). Mr. Fermin writes in his letter to the Court:

> Your Honor, I have spent almost half of my life in prison, and have lost those most close and dear to me over these past 31 years. I only wish to reunite with my 3

4

daughters and multiple grandchildren. I was defiant at the very early stage of my prosecution.

Your Honor, my punishment was just and I have no one to blame but myself, but I am not the same person I was 26 years ago. I ask that you give me this opportunity to live the rest of my life outside of prison.

If I had the opportunity to apologize to each person I have hurt through my crimes, I would. Not just the people directly hurt by my actions but also the people indirectly hurt, like the neighborhoods where drugs were sold and the family members of people whose lives were impacted by drug use.

(*Id.*, Ex. A). The other letters are from two of Mr. Fermin's sisters, his brother, two of his nieces,

and a nephew. (*Id.*, Ex. D).

## II.    LEGAL STANDARD

Section 3582(c)(1)(A), as amended by Section 603(b) of the First Step Act, provides:

[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The changes implemented by the First Step Act allow prisoners to directly petition a

district court, as opposed to the Bureau of Prisons ("BOP"), for a reduction in sentence so long

as they have satisfied the exhaustion requirements. *United States v. Rodriguez*, 451 F. Supp. 3d

392, 396 (E.D. Pa. 2020). Before defendants may petition a court to reduce their sentence under

§ 3582(c)(1)(A), they "must at least ask the Bureau of Prisons (BOP) to [bring a motion] on their

behalf and give BOP thirty days to respond." *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020). Thirty days after submitting the request or after exhausting all administrative appeal rights, whichever is earlier, the defendant may move for compassionate release in the district court. *United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020).

Once his motion is properly before the district court, a defendant must show that "(1) extraordinary and compelling reasons warrant a reduction, (2) the reduction would be consistent with applicable policy statements issued by the Sentencing Commission, and (3) the applicable sentencing factors under § 3553(a) warrant a reduction." *United States v. Rivera*, Crim. No. 06-849, 2022 WL 1284717, at *1 (D.N.J. Apr. 29, 2022) (quoting *United States v. Pabon*, 458 F. Supp. 3d 296, 300 (E.D. Pa. 2020)).

"Extraordinary and compelling reasons" are not defined by statute. Rather, Congress tasked the U.S. Sentencing Commission (the "Commission") with providing further guidance. 28 U.S.C. § 994(t). Congress's only instruction to the Commission was that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." *Id*. The Commission provided guidance at Section 1B1.13 of the U.S. Sentencing Guidelines (the "Guidelines" or "U.S.S.G.").[4] There, the Guidelines explain that extraordinary and compelling reasons exist under six enumerated circumstances. *Id*. Relevant to the present Motion, the Guidelines state that medical circumstances can constitute an extraordinary and compelling reason for a sentence reduction where:

---

[4] The Commission amended this policy statement, effective Nov. 1, 2023, to reflect that a defendant is now authorized to file a motion under 18 U.S.C. § 3582(c)(1)(A) directly with the district court and to expand the list of "extraordinary and compelling reasons" that can warrant a sentence reduction. Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254, 28254–59 (May 3, 2023).

(i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

(ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

(iii) such risk cannot be adequately mitigated in a timely manner.

*Id.* § 1B1.13(b)(1)(D). Separately, extraordinary and compelling reasons exist in some cases where a defendant has received an "unusually long sentence" that would be grossly disparate from the sentence likely to be imposed today for the same crime. *Id.* § 1B1.13(b)(6). The Guidelines also contain a catchall provision that allows courts to grant a sentence reduction when the defendant presents "any other circumstance or combination of circumstances . . . similar in gravity" to those that appear elsewhere in the policy statement. *Id.* § 1B1.13(b)(5).

"Compassionate release is discretionary, not mandatory; therefore, even if a defendant is eligible for it, a district court may deny compassionate release upon determining that a sentence reduction would be inconsistent with the § 3553(a) factors." *United States v. Alexander*, No. 23-1011, 2023 WL 4198042, at *1 (3d Cir. June 27, 2023); *see also United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020) (holding that the district court acted within its discretion to deny compassionate release based on the § 3553(a) factors even where the Government did not dispute that extraordinary and compelling reasons were present). The defendant bears the burden of showing that he is entitled to compassionate release. *United States v. McNair*, 481 F. Supp. 3d 362, 365 (D.N.J. 2020).

## III.    DISCUSSION

As a preliminary matter, the Court finds that Mr. Fermin satisfied the exhaustion requirements such that the Court may consider his Compassionate Release Motion. Mr. Fermin

twice requested that the warden of his detention file a compassionate release motion on his behalf, on January 11, 2022, and again on August 10, 2023. The warden denied both requests. The Government agrees that Mr. Fermin exhausted his administrative remedies. (Gov't Opp'n Br. at 3 (citing *Raia*, 954 F.3d 594)). The Court therefore turns to the substance of the Motion.

### A.      Extraordinary and Compelling Reasons

Mr. Fermin argues that a combination of factors establishes extraordinary and compelling reasons to reduce his sentence. Those factors are (1) that Mr. Fermin's age and health conditions put him at an increased risk of serious illness or death from COVID-19; (2) that due to the harsh prison conditions imposed during COVID-19 pandemic, Mr. Fermin's sentence has been more punitive than could have been anticipated; and (3) that Mr. Fermin's sentence was imposed under a sentencing scheme that has undergone fundamental changes in the intervening years. (Def.'s Br. at 18–24). The Court considers these factors in turn and concludes that none of them—in isolation or in combination—creates extraordinary and compelling reasons that warrant a reduction in Mr. Fermin's sentence.

Mr. Fermin first argues that the risk he faces from COVID-19 should be considered in determining whether extraordinary and compelling reasons exist to reduce his sentence. Mr. Fermin points out that his age and obesity place him at an increased risk of serious illness or death if he contracts COVID-19. (*Id*. at 20–21). The Government adds that Mr. Fermin suffers from hypertension. All three conditions—advanced age, obesity, and hypertension—appear on the CDC's list of medical conditions that increase a person's risk from COVID-19. *People with Certain Medical Conditions*, Ctr. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated May 11, 2023). However, Mr. Fermin has already contracted and

recovered from COVID-19 twice, (Def.'s Br. at 20), and has been vaccinated against the virus. (Gov't Opp'n Br. at 3).

The Court construes Mr. Fermin's argument as falling under U.S.S.G. § 1B1.13(b)(1)(D) addressing the outbreak of infectious disease and finds that Mr. Fermin has not demonstrated that the first or third prong of that provision are met here. First, the correctional facility where Mr. Fermin is housed is not affected or at imminent risk of being affected by a COVID-19 outbreak or by an ongoing public health emergency. There are currently no active cases of COVID-19 among inmates at USP Canaan. *Inmate COVID-19 Data*, Fed. Bureau of Prisons, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp (last visited April 5, 2024). More than half the inmate population there is fully vaccinated against COVID-19, *id.*,[5] and the Government has represented in other compassionate release cases that the BOP has offered a vaccine to every inmate in BOP-managed institutions. *See, e.g.*, *United States v. Grace*, Crim No. 17-144, 2021 WL 5647788, at *1 (W.D. Pa. Nov. 30, 2021); *United States v. Garcia*, Crim. No. 93-536, 2024 WL 749010, at *6 (D.N.J. Feb. 23, 2024). The vaccination of inmates and staff greatly reduces the risk of COVID-19 exposure and infection within a facility. *See United States v. Martinez*, Crim. No. 16-503, 2022 WL 1320618, at *4 (D.N.J. May 2, 2022) ("The likelihood of a COVID-19 infection has also been greatly reduced by vaccination of [the defendant] and others at the prison."). Moreover, the national emergency related to the COVID-19 pandemic that was declared by President Trump on March 13, 2020, was terminated by President Biden on April 10, 2023. Pub. L. No. 118-3, 139 Stat. 6. Likewise, the public health emergency related to COVID-19 ended May 11, 2023. *See, e.g.*, *End of the Federal COVID-19 Public Health*

---

[5] As of April 5, 2024, 712 inmates out of a population of 1,279 at USP Canaan—roughly 56%— have been fully vaccinated.

*Emergency (PHE) Declaration*, Ctr. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html (last updated September 12, 2023). Therefore, USP Canaan is not affected by an ongoing public health emergency related to COVID-19.

Second, although Mr. Fermin does present some medical conditions that put him at elevated risk of illness from COVID-19, he has not demonstrated that such risk cannot be adequately mitigated in a timely manner. Mr. Fermin's point is well taken that just because he has recovered twice from COVID-19 does not guarantee that he will avoid complications from any future infection. (Def.'s Br. at 20). However, the fact he has been vaccinated against COVID-19 reduces the risk of such complications. "Other courts in the Third Circuit have agreed that the protection provided by an authorized COVID-19 vaccination reduces the risk of serious illness from COVID-19 to such a degree that the threat of the pandemic alone cannot present an extraordinary and compelling reason for compassionate release." *United States v. Hannigan*, Crim. No. 19-373, 2021 WL 1599707, at *6 (E.D. Pa. Apr. 22, 2021) (citing cases). The Third Circuit has likewise recognized in an unpublished decision that "[g]iven vaccine availability, a prisoner likely will not be able to prove that his personal risk of serious illness from COVID-19 is an extraordinary and compelling reason for release unless he can convincingly show that he is 'unable to receive or benefit from a vaccine' or that he 'remain[s] vulnerable to severe infection, notwithstanding the vaccine.'" *United States v. Estevez-Ulloa*, No. 21-2432, 2022 WL 1165771, at *2 (3d Cir. Apr. 20, 2022) (citing *United States v. Rucker*, 27 F.4th 560, 563 (7th Cir. 2022)). Mr. Fermin makes neither showing here.

Mr. Fermin next argues that the harsh conditions experienced by prisoners during the COVID-19 pandemic is "relevant" to the analysis of extraordinary and compelling reasons.

(Def.'s Br. at 22). Mr. Fermin cites three cases in which district courts granted reduced sentences based, at least in part, on the consideration that steps taken by the BOP to combat the spread of the virus—including lockdowns, suspension of programs, and reduced visitation—resulted in conditions of confinement that were "far harsher and more punitive than the Court had anticipated at sentencing." (*Id.* (quoting *United States v. Rodriguez*, 492 F. Supp. 3d 306, 316 (S.D.N.Y. 2020))).

In response, the Government construes Mr. Fermin's argument as falling under U.S.S.G. § 1B1.13(b)(5), which provides that a defendant can show extraordinary and compelling reasons under "any other circumstance . . . similar in gravity" to those that appear elsewhere in the policy statement. The Government cites to the reasoning of another district court that considered a similar argument and concluded that "[o]perational difficulties at prisons during the COVID-19 pandemic is [sic] not similar in gravity to the extraordinary and compelling reasons set forth" elsewhere in § 1B1.13(b). *United States v. Hernandez*, Crim. No. 19-10002-02, 2024 WL 52287, at *3 (D. Kan. Jan. 4, 2024). According to the logic of the proffered argument, the court reasoned, "everyone who was incarcerated during the height of the COVID-19 pandemic should receive a sentence reduction." *Id.* Further, the U.S. Sentencing Commission had the opportunity to revise the Guidelines to take account of the effects of COVID-19 on prison operations but "did not identify modified, difficult, or harsh prison conditions as an extraordinary and compelling reason warranting a reduction in sentence." *Id.*

Although sympathetic to the challenging conditions to which Mr. Fermin was undoubtedly subjected during the height of the COVID-19 pandemic, the Court agrees with the reasoning of the case cited by the Government. Because Mr. Fermin endured the same harsh conditions as many others incarcerated during the pandemic, this factor does not, on its own, rise

to the level of an extraordinary and compelling reason to reduce his sentence. At best, this factor, in the words of a case cited by Mr. Fermin, "weighs in favor of a finding of extraordinary and compelling reasons." *Rodriguez*, 492 F. Supp. 3d at 311. But here, unlike in *Rodriguez*, the Court concludes that Mr. Fermin does not present extraordinary and compelling reasons for a reduced sentence even when considering this factor in combination with his other arguments.

Third and finally, Mr. Fermin urges the Court to find extraordinary and compelling reasons in the fact that sentencing law has changed dramatically since Mr. Fermin was sentenced to life in prison. He points specifically to *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, which made the Guidelines advisory rather than mandatory, *id*. at 245, and clarified that a sentencing court may not "presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). Mr. Fermin was sentenced under the pre-*Booker*, mandatory Guidelines. Under current law, Mr. Fermin argues that not only would he "be eligible for a sentence of less than life, but a sentencing court would be required to consider whether a sentence of less than life would be reasonable." (Def.'s Br. at 23). He invokes U.S.S.G. § 1B1.13(b)(6), which, as noted, provides that extraordinary and compelling reasons exist in some cases where a defendant has received an "unusually long sentence" that would be grossly disparate from the sentence likely to be imposed today for the same crime.[6]

The Court, however, agrees with the Government that this argument is unavailing. Mr. Fermin fails to demonstrate that the life sentence he received in 1997 would be grossly disparate from that he would receive if sentenced today for the same crime. As the Government points out, Mr. Fermin's total offense level calculated under the 1995 Guidelines Manual—Level 45—

---

[6] The Government argues that the Commission exceeded its authority in promulgating U.S.S.G. § 1B1.13(b)(6). (Gov't Opp'n Br. at 12–20). The Court takes no position on this matter.

would be the same under the current Guidelines Manual. *See* PSR ¶¶ 99–127; U.S.S.G.

§§ 2A1.1, 2D1.1, 2E1.1, 3D1.4. Then, as now, an offense level of 45, which is two points higher

than the maximum offense level in the Sentencing Table, corresponds to a Guidelines range of

life imprisonment. U.S.S.G. § 5A (1995 and 2023 versions). The Government also notes that

between 2015 and 2022, roughly one in five defendants sentenced, like Mr. Fermin, under

U.S.S.G. § 2A1.1 and with a criminal history category of I received a life sentence. (Gov't Opp'n

Br. at 20 (citing Commission data)). While it is true, as Mr. Fermin argues, that Mr. Fermin's

sentence is therefore longer than the sentences imposed on the majority of similarly situated

defendants, (Def.'s Reply Br. at 12), this fact does not demonstrate there is a "gross disparity"

between Mr. Fermin's sentence and the sentence that would likely be imposed if he were

sentenced today. *See* U.S.S.G. § 1B1.13(b)(6). In other words, Mr. Fermin cannot demonstrate

extraordinary and compelling reasons for compassionate release due to an "unusually long

sentence" under § 1B1.13(b)(6).

Further, the Court is not convinced that the mandatory nature of the pre-*Booker*

Guidelines drove the sentence imposed on Mr. Fermin. Mr. Fermin was sentenced to three

concurrent life sentences and two concurrent sentences of 240 months. (ECF No. 323; ECF No.

394, Sent'g Tr. at 86). Prior to imposing Mr. Fermin's sentence, the sentencing judge decried the

"pervasive, virulent problem of drugs" and stressed the need to "impose sentence on these drug

defendants, heavy sentences, and hope and pray yet once again that those sentences will have an

impact." (Sent'g Tr. at 79–85). In the words of a case cited favorably by Mr. Fermin, "[t]here is

no suggestion that the sentencing judge believed the mandatory life sentences were unfair and

utterly disproportionate to the crimes, or far greater than necessary to achieve the ends of

justice." *United States v. McDonald*, Crim. No. 94-20256, 2020 WL 3166741, at *6 (W.D. Tenn.

June 8, 2020) (cleaned up). Therefore, the fact that Mr. Fermin's life sentence was imposed under the now-defunct mandatory Guidelines regime does not persuade the Court that it is an extraordinary and compelling reason to grant a reduction in sentence.

In conclusion, none of the factors pointed to by Mr. Fermin, on their own or in combination, amount to an extraordinary and compelling reason for the Court to grant his Motion.

**B.      Section 3553(a) Factors**

Even if Mr. Fermin were able to demonstrate extraordinary and compelling reasons for a reduction in his sentence, granting the Motion would not be appropriate upon consideration of the § 3553(a) factors. As noted, in considering whether to reduce a defendant's sentence, a court must look to the factors contained in 18 U.S.C. § 3553(a). These factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

The nature and circumstances of Mr. Fermin's offenses, *see id*. § 3553(a)(1), show them to be particularly grave. The Gonzalez organization was responsible for distributing an estimated ten to thirty kilograms of heroin to individuals in Camden, (Sent'g Tr. at 81), and for murdering Mr. Coleman. While the testimony elicited at trial may not have definitively linked Mr. Fermin to the plot to kill Mr. Coleman, the testimony clearly established that Mr. Fermin was intricately involved in the day-to-day operations of the Gonzales organization. Mr. Fermin supplied,

processed, packaged, stored, transported, and delivered heroin. He also recruited sellers, selected managers, and collected the proceeds from the drug sales. Mr. Fermin was an essential leader of a group whose members contracted $5,000 for the killing of a competing drug dealer and police informant.

Given the nature and circumstances of Mr. Fermin's offenses, the Court is mindful of the need for the sentence imposed to reflect its seriousness, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes by the defendant. 18 U.S.C. § 3553(a)(2)(A)–(C). Reducing Mr. Fermin's sentence would send the wrong message to the public about the gravity of his offenses, which spanned several years and resulted in the death of Mr. Coleman. Similarly, the Court believes that denying Mr. Fermin's Motion best promotes respect for the law, provides just punishment, and sends the message to society at large that the justice system will respond aggressively to crimes of this nature. The Court is less concerned that Mr. Fermin would still be a danger to the public if released. Mr. Fermin has a mixed disciplinary record while incarcerated, facing discipline most recently in 2017 for fighting with another inmate. He is now 68, and his more serious infractions for possessing a dangerous weapon and assaulting another person with serious injury are sixteen or more years in the past. Nonetheless, the § 3553(a) factors, on the whole, do not favor granting Mr. Fermin's Motion at this time.

Finally, the Court acknowledges the steps that Mr. Fermin has apparently taken toward rehabilitation. Mr. Fermin submitted a heartfelt letter to the Court accompanying his Motion in which he expressed remorse for his crimes and noted his commitment to his Christian faith. (Def.'s Br., Ex. A). In their letters, Mr. Fermin's family members report that Mr. Fermin "has become very religious and remorseful"; is "spiritual and humble"; "has actively participated in

various rehabilitation programs, including educational courses, vocational training, and counseling sessions"; and "has pursued academic excellence with enthusiasm and determination." (*Id.*, Ex. D). The Court is encouraged to hear these accounts of Mr. Fermin's character and activities while in prison. However, consideration of Mr. Fermin's rehabilitation does not alter the Court's conclusion that a sentencing reduction is not appropriate at this time.

This Court has the discretion to deny a compassionate release motion based on the § 3553(a) factors even where a defendant can show that extraordinary and compelling reasons support his release. *See Alexander*, 2023 WL 4198042, at \*1. Here, even if Mr. Fermin could present extraordinary and compelling reasons for a reduction in sentence, the Court would still deny his Motion based on the § 3553(a) factors.

## IV.   CONCLUSION

For the foregoing reasons, Mr. Fermin's Compassionate Release Motion (ECF No. 734) is **DENIED**. An Order follows.


Dated:    April 5, 2024                            /s/ Robert B. Kugler
                                                   ROBERT B. KUGLER
                                                   United States District Judge